Good morning. May it please the court. This is a case involving the distinction between reasonable suspicion and probable cause. There are many subsidiary issues, but the principle of the case is that there is a reasonable suspicion and there is a probable cause. The principle issue, I believe, is this distinction between reasonable suspicion and probable cause. Mr. Centeno was arrested on what was barely reasonable suspicion. At page 34 of its brief, the United States quotes the district court's statement that, quote, Centeno was lawfully arrested on suspicion that he had committed a firearms-related crime in the United States. That confusion, that failure to draw a firm line between reasonable suspicion and probable cause resulted here in an arrest that was illegal and a search that was illegal. There was, on the record presented in the district court at the suppression hearing, reasonable suspicion. I will later address the fact that the basis for that reasonable suspicion disappeared when it was learned that the telephone calls relied upon didn't happen and or did not contain a reasonable suspicion. I will later address the fact that the telephone calls relied upon didn't happen when it was learned that the telephone calls relied upon didn't happen and or did not contain any information about Mr. Centeno's truck, the description of which was the reason for his being stopped and almost immediately arrested. You're saying that they stopped a white Toyota truck just with information out of the clear blue sky? They received, I don't know what information they received. Well, why did they stop that truck in particular? They stopped that truck because they were looking, apparently, for a white Toyota truck. And how did they get information? That is not clear on this record, Your Honor. Well, isn't there information to the effect that they received two phone calls to that effect? There is, but the 911 calls make it clear that the calls, calls, two calls to 911 said nothing about a white Toyota truck. Doesn't the record indicate that there were two different phone systems that, apart from the 911 calls, that there were calls received directly? At the suppression hearing, the officer testified that she received calls at the police station from people that described the truck, that she heard the detonations. However, it turns out that, in fact, there were no calls received at the station for half an hour before or after. That information was not presented at the suppression hearing. The defense introduced, sought to introduce it at trial. But doesn't that just present a conflict in the evidence? We have affirmative testimony that the information was received, and then there's some confusion about the timing? No, Your Honor. I don't believe it was confusion about the timing. I believe that on this record, the full record, the evidence shows that there were no phone calls about a white Toyota passing firearms to the gray car. I don't know exactly what happened. I wasn't there. But the testimony about the white Toyota depends entirely on phone calls received at the police station. And according to the records of the police station, there were no phone calls at all made. If we assume that the officer who testified that there were calls, that a white Tundra was described and that she heard a gunshot, I mean, assuming we accept that as credible evidence, then isn't there a probable cause? No, Your Honor. I would say there's reasonable suspicion to stop and see if the driver of this car is... But given the proximity of the stop to the phone call, I know you doubt the phone calls, but given the proximity, given the fact that it was only one road coming out of that community, given that it was the only car hitting that description... It's not a description with a license plate such as you had in Navarrete. In Navarrete, there was a real 911 call. There was a real emergency that the caller was experiencing. The caller was traceable. They gave a description of the car, the make, and the license plate or the mile marker. I don't disagree, but wasn't the testimony that the time that they were stationed on that road where they had stopped the defendant, that no other car... And they were there quite a while, and one of your arguments is that they overly detained the defendant. Their testimony is that no other car, even that general description, passed by them. Your Honor, I could be mistaken, but I believe that testimony about they didn't see another car relates to the period before they stopped, not while the entire period they were there. But it doesn't matter, Your Honor, because on that general description, I recognize that assuming the calls were made, they had a right to stop the car. They had a right to inquire of Mr. Centeno. They had a right to order him out of the truck, pat him down, and find out what was going on. But they didn't... Your argument depends on whether the calls were made or not. No, it doesn't, Your Honor, because I submit they did not have a probable cause. If they made a call and said, we just saw a white Toyota run over somebody, before that another call saying that they had seen somebody transfer objects from one car to the other, one car being the white Toyota. From the Toyota to another car. The other car. The other car then proceeds to shoot somebody. All right? Assuming those calls were made. Yes. And that the only car that is intercepted going out of that town is a white Toyota, you don't think that's an unprovable cause? I do not believe it's a probable cause. I do believe it's reasonable suspicion to stop the car. But probable cause requires reason to believe that this defendant was involved in that incident. And the mere fact that he was driving a car with a similar description does not cross the line. There's more than that, though, isn't there? Aren't you neglecting Judge Thompson's point? There would have been reasonable suspicion to stop any vehicle matching that description leaving on any road, but there was just one road and the officers knew that there was only one road. That's why they were there. Well, actually, there were two. They went in two different directions. There were several what were described as smaller streets in between. There was a main highway to reach the next large town. I don't think that adds anything. Well, yes, because if the Toyota were fleeing from the scene of the crime, it would have, A, probably been able to get away faster. B, there were intermediate roads it could have taken, not necessarily the main and obvious one. And C, there could have been other white Toyotas on those other roads. So there was not just one road. You said faster. Does the record show the speed at which the white Toyota was intercepted? It does not, Your Honor, but he was not stopped for speeding. He was apparently not. I didn't ask that. I just wanted to know what speed he was going at. That does not appear in the record. It was not. The lapse of time between the calls and when he was stopped is not at all disproportionate to the time it took the officers to go from where they stopped him back to the scene. There is conflicting testimony about the exact amount of time, how much time elapsed between the call and the stop, and how much time it took the officers to go from the scene of the stop back to the scene of the crime. At some point it says ten minutes. At some point some of them say two to four minutes. But he was not stopped so quickly that he would have had to be speeding to get to where he was on this record. You don't disagree that it's a totality of the circumstances? Of course not. We don't disagree on that. And there are other circumstances that have been pointed out by the United States. The fact that he didn't stop immediately. But this was a well-traveled road. This was not a high-crime area late at night. This was a well-traveled road. It was around 7 o'clock, yeah, a quarter of 7 to 7 o'clock at night. And he pulled over in front of a supermarket where I assume there's a parking lot or a place to stop. I think that an interesting contrast is the case of Ruidas in which this court said that it was close to the limits of reasonable suspicion. That was a response to a call at a specific address, a make and color of a car. The police arrived, saw a car parked catty-corner jutting out illegally, went over to the car. The person in the driver's seat was non-responsive when the police – and the call was because there was a shooting at that address. The driver was non-responsive. And when the police finally got a response, it was very aggressive and hostile. The court said, well, this is very – this tests the limits of reasonable suspicion. Well, I don't submit that this case tests the limits of reasonable suspicion, but I think it crosses the line between reasonable suspicion and probable cause. Can we say it tests the limits of probable cause? I think it fails to cross the line between reasonable suspicion and probable cause. I want to address the dog sniff, number one, because I think this is a unique case. Obviously, if the arrest is illegal, the rest of the evidence falls. I believe that's obvious. I'd be happy to entertain any questions or doubts the court has. Well, what about the converse? If the arrest was lawful, that is to say supported by probable cause? That's where I'm going now. All right. If the arrest was lawful, then the search of the truck was not lawful. Number one, by the time the dog sniffed the truck, the officers knew that there was something seriously wrong with the information they had about the white truck. They needed – Counselor, can I ask you something as a practical matter, and then I'll let you get back to your thought? From a practical point of view, if we determined that there was probable cause for the arrest, he was a sole passenger, and they would have towed the car and done an inventory search anyway, wouldn't they? We don't know, Your Honor. There's no evidence on the record, and that's not necessarily the case. He was not stopped in the middle of the highway. He was not obstructing traffic. It was not creating a problem. And there was no evidence whatsoever about a policy, about towing or inventory search. And in an inventory search, it may well be that they would not have discovered this compartment. So I don't think that the prosecution met its burden to show inevitable discovery here. I think that's just not present on this record. So theoretically, could it have happened? Maybe, depending on the facts. But this is the prosecution's burden. It was not shown. I want to get back. So assuming that the SNF is a search, why don't the facts that we are, for present purposes, assuming constitute probable cause for the arrest, also constitute probable cause for the SNF? Because by that time they knew that there was, the white Toyota had not run over anybody. There was no run over, no hit and run victim at the scene. They had been to the scene. Did they find blood on the ground? Yes, there was a shooting. There was a person who was dead from multiple gunshots. The white Toyota was associated with that murder. That's the theory, yes. A white Toyota was associated with the shooting. Maybe there was not someone also, in addition, run over, but there was a white Toyota associated with the shooting and that the white Toyota allegedly passed the guns to the gray automobile who carried out the shooting. Yes, those are the facts that are on the record, except that by the time we get to the search warrant and some of the other testimony, what's being passed is not a gun but object. So it's not clear what someone, if someone called, saw. But, again, I can't ignore the fact that the 911 calls don't mention a white Toyota. There was a... There was other calls, weren't there? Excuse me? Isn't the evidence to the effect that the calls did not, those first calls didn't go to 911, they went otherwise? That was the testimony. And that's what the magistrate believed. That is not, well, the magistrate believed there was no probable cause. All right. But the magistrate believed that there were calls, didn't he? He did because he didn't have all of this information. He didn't have the information that there were, he didn't have the 911 calls in front of him. He didn't have the information that there were no phone calls to the station during the half hour before or after. The testimony was absolutely consistent about the time of the events and the calls. All right. We'll hear from the government. Thank you. I'll rest on my brief for the evidentiary questions. Yes, of course. May it please the Court, Alexander Ulum on behalf of the United States. Your Honors, the conviction should be affirmed because the district court correctly denied the defendant's motion to suppress. And turning to the suppression issue, the first issue I'd like to address is standing. This defendant never established that he was in legitimate possession of the vehicle that was detained on the date of his arrest. It is his burden to establish that he had standing. It is not the government's burden to establish that standing is lacking. And at a minimum, we would submit that he had the burden of establishing that he was in legitimate possession of that vehicle. And here's what we don't know. We don't know when he came into possession of that vehicle, how he came into possession of that vehicle, whether it was a gift, whether he stole it, whether he himself killed the vehicle's previous owner. What the record reflects is that the owner of the vehicle was killed in January of 2015, just four months prior to the intervention with the defendant. We don't know how often he used it. What we do know is that the person who was the registered owner of that Mr. Centeno never met him, had never seen him. Is that all that's in the record? It is, Your Honor. It is. The vehicle was never reported stolen. The vehicle was never reported stolen, but the registered owner of the vehicle testified at trial. Soraya Rondon Bruno. But she never said it was stolen. She never said it was stolen. She testified that she had purchased the vehicle for her brother, and that her brother died, was killed in January of 2015, and she was specifically asked whether she had ever seen the defendant, and her answer was no. She was asked whether she had ever authorized the defendant to use that vehicle. Her answer was no. But she had never reported the car stolen after his death. She had never reported the car stolen. And the car was for the brother. That's right, Your Honor. Who had legal possession and authority to give the car to someone else. Correct. What is lacking, the gap in the record, is whether the brother ever actually authorized the defendant to have legitimate possession of that vehicle. And, again, that... I guess the only point I'm trying to figure out is, given the length of time between the death and the stop, the car wasn't reported stolen. The car was not reported stolen, no. So this question of standing, or more precisely privacy interest in the vehicle, was this even litigated in front of the magistrate? It was not litigated in front of the magistrate, Your Honor. Then why are we talking about it? Because it was raised before the district court. Who decided not to go into it since there was an unclear record or no record. Who decided not to... Well, the reason he decided not to go into it was because the district judge determined that it was unnecessary to go into it, because going into the merits of the suppression issue, he could conclude that the motion to suppress should be denied. What the district judge determined was that if the standing issue were critical, he would reopen the hearing for purposes of allowing the defendant to establish standing. But because he determined that that was not necessary, he did not address the standing issue. Turning to the merits, the first point we would like to address is that there was probable cause for the arrest. By the time that the Toyota Tundra was detained, there had been two different calls to the police station from two different people. And that was the testimony of the Juncos municipal police officer who received the calls. Is there a record of these calls? There is the testimony of the dispatch officer who received them. That wasn't my question. Is there a record? If your honor is asking about toll records... Any kind of record, a paid or written record that they were received? No, your honor. No, your honor. This is based on the testimony of the municipal policeman? This is based on the testimony of the municipal police officer. That's correct. Testimony which I should emphasize, the magistrate judge found it credible. The defense did not object to the magistrate judge's factual findings. And from our perspective, any notion that the calls were actually not received should be waived. Was the defendant allowed to explore what the custom and practice was for making some kind of notation when these calls came in to dispatch? Your honor, at the suppression hearing, I believe that the defense during cross-examination of the dispatch officer testified to having received these calls. It just strikes me unusual that there's not some type of record kept of the calls that a dispatcher would receive. Assuming there's no recording, which I always thought they were recorded, it just strikes me as odd that there's not some kind of official record kept of a call like this. There is no official record, your honor. However, the defense had the... I'm sorry, there was no recording? There was no recording. There was no recording. However, the defense had the opportunity to cross-examine this witness at the suppression hearing, and they explored that. And in spite of their cross-examination, the magistrate judge determined that this officer's testimony was credible, and the defense never objected to that factual finding. Now, I think for purposes of this appeal... I'm sorry, can I ask you just one more question? I'm sorry. Was that issue at all re-litigated before the district court? There was an effort to re-litigate that issue in the middle of trial before a jury, and the government objected because from the government's perspective, that was not an issue that would be properly presented to the jury, because a jury does not decide Fourth Amendment issues. That is a matter for the court to decide. And that would have amounted to impeachment on a collateral matter that was immaterial to whether the defendant committed the offenses charged in the And I take it the objection was sustained on that basis? The objection was sustained on that basis, Your Honor. The defense attempted to... They proffered evidence from the telephone company that the defense purported to prove that no calls were received. Right, so did the defense at this point in time in front of the trial judge make any suggestion or proffer that this was a frame-up? I mean, it seems to me that if their point is that there were no calls, and yet the calls had some considerable detail, and it actually resulted in police officers going to the scene and making a stop, that what logically flows from the position that there were no calls made is that it was a frame-up. Was any of that discussed? That would be material at trial. That's not just a Fourth Amendment issue. It's not collateral. At all. So was there any discussion about that, about why they wanted this stuff in? The lack of a phone call entered into evidence? When the judge pressed the defense as to why this was relevant, the defense's response was essentially that it's relevant because it's relevant because this is all made up. If my memory serves me right, that's what the defense said. So that's the answer. They did press it then. A frame-up is no different from made up. Your Honor, I think the critical inquiry is these calls related to the reason for the stop. The defendant was not charged with a shooting at Estancia de la Ceiba. The defendant was not charged with transferring firearms from one vehicle to another. But you wouldn't have been sniffing his car but for the incident. Correct, Your Honor. And that would have been. So if it was framed from the beginning, then you would have had no reason to stop the car. That's right, Your Honor. And that's an issue that could have and should have been addressed at the suppression hearing. Not at trial in front of a jury. And I would also point out that the government requested on multiple occasions, the government requested reciprocal discovery from the defense. The defense, we presume, had these records for quite some time and never turned it over to us. And that is an issue that we raised that sidebar with the judge because these records, they were sprung at us in the middle of trial. What record are we talking about? We're talking about the telephone toll records to the Juncos Municipal Police Station that appears in the appendix. So you're talking about the records that show that no calls, no direct calls were made. Well, Your Honor, I'm glad you asked that because we would submit that the records don't actually show that at all. The defense elicited at trial that the Juncos Municipal Police Department had two phone numbers. That there were two phone numbers that went to the police department. And those records pertain only to one of those phone numbers. So we don't know, or at least the record doesn't reflect what the other one of those phone numbers would reflect. But be that as it may. Are both of those public numbers? Yes, they are. They are public numbers, Your Honor. Be that as it may, the issue as to whether the calls were received, we would still submit, would be collateral. They would be collateral because they go to the reason for the stop. They have nothing whatsoever to do with any issue of material fact that was before that jury. And what was before that jury was whether the defendant possessed with intent to distribute crack cocaine, whether he possessed a firearm after having been convicted of a felony, and whether he possessed a firearm in furtherance of a drug trafficking crime. Could you get to the dog sniff issue? Yes, Your Honor. Our first point would be that the dog sniff was not a search. The dog sniff was reasonably related in scope to the reason for the stop. And the reason for the stop was to investigate firearms-related offenses at the urbanization. I would point out... How do you address the argument that the Supreme Court cases limit those kinds of dog sniffs to contraband because there's no legitimate expectation of privacy in the possession of contraband, whereas the possession of guns is legal? Well, I would make... I would answer your question in two parts, Your Honor. First of all, I would say that the Supreme Court has also recognized that there is a diminished expectation of privacy in automobiles. That's why we have the automobile exception. The second part of my... I'm sorry? It's not that diminished. No, but it's more diminished, for example, than the expectation that one would have in his or her residence. My second point is that in this particular case, evidence that the vehicle had firearms would have been evidence of criminal offenses at Estancia de la Ceiba. Or at a minimum, there would have been a fair probability or a reasonable likelihood that they would... Why does the dog sniff? I mean, because the evidence in this case is that the flight court was handing off guns. So would the dog be picking up residue? It could have. No, but tell me what it does. The dog sniff was... walked around the exterior of the vehicle, was trained to detect firearms. But what about a firearm? I have to say I'm new to this idea that a dog can sniff a gun. Right, me too. I'd never heard of that. So is it gunpowder residue? Or what is it sniffing? Our understanding is that it is not metal. It would be gunpowder. It would be... What? Particular items that are particular to firearms, Your Honor. Well, it's metal. But not just metal. Well, oil. Do they smell the oil? The record does not reflect whether they smell oil. I see that my... How is there a scientific foundation for this? Your Honor, what I would point out is that at the suppression hearing, the defense itself stipulated that the dog was, that the canine was properly trained and reliable in the detection of firearms. All right, thank you. Thank you, Your Honor.